IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

Civil Case No.: 5:11-cv-273-BO

| | | |
|---|---|---|
| HENRY PASHBY, ANNIE BAXLEY, MARGARET DREW, DEBORAH FORD, MELISSA GABIJAN, by her guardian and next friend JAMIE GABIJAN, MICHEAL HUTTER, JAMES MOORE, LUCRETIA MOORE, AYLEAH PHILLIPS, ALICE SHROPSHIRE, SANDY SPLAWN, ROBERT JONES, and REBECCA PETTIGREW on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) | FIRST AMENDED COMPLAINT |
| Plaintiffs, | ) ) | |
| v. | ) ) | CLASS ACTION |
| LANIER CANSLER, in his official capacity as Secretary of the North Carolina Department of Health and Human Services, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## I. INTRODUCTION

1.      This suit challenges the North Carolina Department of Health and Human

Services' (DHHS) new rules restricting coverage of Medicaid-covered Personal Care Services

(PCS) for adults over age 20.   PCS are provided to elderly and disabled individuals who require

assistance with certain basic tasks of daily living, such as eating, bathing, dressing, and toileting.

Under the new rules, effective June 1, 2011, PCS coverage will be terminated for about 3,500 to

4,000 elderly, blind, or disabled North Carolina citizens who rely on these services to live safely

in their homes and communities.

1

2. Under DHHS's new rules, individuals who reside in assisted living facilities known as Adult Care Homes (ACHs) need to satisfy much less restrictive criteria to qualify for PCS than those living in their homes. Most ACHs are large, institutional settings and many are located in isolated rural areas, far from the communities in which the residents would otherwise live. As a result of Defendant's new eligibility criteria, individuals in ACHs with much less severe disabilities and lesser needs will be able to receive PCS, while individuals living in their homes with much greater needs will not have access to PCS unless they move to an ACH.

3. The named Plaintiffs and members of the Plaintiff class have received notices informing them that they no longer qualify for PCS. These notices are confusing, lack necessary information, and do not comply with the requirements of the Medicaid Act and the U.S. Constitution.

4. DHHS's illegal policies and practices will cause irreparable harm to the Plaintiffs and the Plaintiff class. Terminating coverage of PCS that has been found necessary by Plaintiffs' treating physicians will place the health and safety of Plaintiffs and the plaintiff class at risk. In addition, in order to get the PCS they need, many will have no option but to move into ACHs, which are, in many cases, institutional settings far from their communities. In the alternative, the lack of PCS will cause their health to deteriorate to the point that they require hospitalization or placement in Medicaid-funded nursing facilities, which are significantly more expensive than services provided in the home. Accordingly, these policies violate the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act, which require that publicly funded services, including Medicaid, be provided in the most integrated setting appropriate to an individual's needs.

2

5.     DHHS's policies and practices used in reducing and terminating PCS for 3,500 - 4,000 individuals violate Medicaid requirements that services be made available in comparable amount, duration, and scope to similarly eligible individuals, and that states determine the extent of Medicaid services according to reasonable standards.

6.     The Plaintiffs seek prospective declaratory and injunctive relief against DHHS Secretary Lanier Cansler (Defendant), in his official capacity, to enjoin him from implementing the new PCS rules applicable to individuals over age 20 and from denying, terminating or reducing coverage of PCS and, if necessary, requiring him to reinstate services that have been illegally reduced or terminated until Defendant has brought his practices and procedures into compliance with the Medicaid Act, the ADA, Section 504, and the Due Process Clause of the U.S. Constitution.

## II.     JURISDICTION AND VENUE

7.     Jurisdiction is conferred on this Court by 28 U.S.C. § 1331, which provides for original jurisdiction over all civil suits involving questions of federal law, and 28 U.S.C. §§ 1343(3) and (4), which grant this Court original jurisdiction in all actions authorized by 42 U.S.C. § 1983 to redress the deprivation under color of State law of any rights, privileges, or immunities guaranteed by the U.S. Constitution and Acts of Congress.

8.     Plaintiff seeks declaratory, injunctive and other appropriate relief, pursuant to 28 U.S.C. §§ 2201 and 2202; Fed. R. Civ. P. 23, 57, and 65; 42 U.S.C. § 1983; and the Fourteenth Amendment to the U.S. Constitution.

9.     Venue for this action lies in this District pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here and the Defendants may be found here.

## III.   PARTIES

10.   Defendant Lanier Cansler is the Secretary of the North Carolina Department of Health and Human Services.  He is charged with overall responsibility for the administration of DHHS, which administers the Medicaid program in North Carolina.  He is sued in his official capacity.

11.   DHHS has been designated as the "single state agency" with direct responsibility for administration of the state Medicaid plan.  *See* 42 U.S.C. § 1396a(a)(5); N.C. Gen. Stat. § 108A-54.

12.   DHHS is a recipient of federal funding in the form of Medicaid payments.

13.   DHHS is a public entity within the meaning of the ADA.

## IV.   CLASS ACTION ALLEGATIONS

14.   This action is brought as a statewide class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2) on behalf of all current or future North Carolina Medicaid recipients age 21 or older who have, or will have, coverage of PCS denied, delayed, interrupted, terminated, or reduced by Defendant directly or through his agents or assigns as a result of the new eligibility requirements for in-home PCS and unlawful policies contained in Defendant's  Clinical Coverage Policy 3E (ICHA Policy 3E).

15.   The class is so numerous that joinder of all members is impracticable.

16.   There are questions of law and fact as to the permissibility of the Defendant's policies and practices with respect to denying, reducing, and terminating PCS coverage for Medicaid beneficiaries that are common to all members of the class.

17.   The claims of the class representative Plaintiffs are typical of the claims of the class.

18.     Named Plaintiffs will fairly and adequately represent the interests of all members of the class. Specifically, they meet the eligibility requirements under the current PCS policy, have been informed they will be ineligible for the new program effective June 1, 2011, and are at risk of institutionalization without the help they are currently receiving.

19.     Prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members which would establish incompatible standards of conduct for the party opposing the class or could as a practical matter be dispositive of the interests of the other members or substantially impair or impede their ability to protect their interests.

20.     Defendant's actions and omissions have affected and will affect the class generally, thereby making appropriate final injunctive and declaratory relief with respect to the class as a whole.

## V.  STATUTORY AND REGULATORY FRAMEWORK

### A.     <u>Medicaid Requirements</u>

21.     The Medicaid Act, Title XIX of the Social Security Act, 42 U.S.C. § 1396-1396w-5, establishes a medical assistance program cooperatively funded by the federal and state governments.  Medicaid is designed to "enabl[e] each State, as far as practicable . . . to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence and self-care. . ." 42 U.S.C. § 1396-1.  States are required to administer Medicaid "in the best interests of recipients."  *Id.* § 1396a(a)(19).

22.     The Medicaid program typically does not directly provide health care services to eligible individuals, nor does it provide beneficiaries with money to purchase health care directly.  Rather, Medicaid is a vendor payment program, wherein Medicaid-participating providers—including providers of PCS —are reimbursed by the program for the services they provide to recipients.

23.     The Centers for Medicare & Medicaid Services (CMS) of the United States Department of Health and Human Services is the agency that administers Medicaid at the federal level, including publishing rules and guidelines.  These rules and regulations are set forth in 42 C.F.R. §§ 430.0-483.480, and in the CMS *State Medicaid Manual*.  These rules and regulations are binding on all states that participate in Medicaid.

24.      A state's participation in Medicaid is voluntary.  Once a state elects to participate, it must adhere to the federal legal requirements, as provided by the United States Constitution, the Medicaid Act, and the rules promulgated by CMS.   North Carolina has elected to participate in the Medicaid program.  N.C. Gen. Stat. § 108A-54.

25.     The state must adopt a plan that meets the requirements of the Medicaid Act.  42 U.S.C. § 1396; 42 C.F.R. § 430.12.  States can make changes to their Medicaid programs by submitting state plan amendments for CMS's approval.  42 U.S.C. § 1396; 42 C.F.R. § 430.12.

26.     The Medicaid Act provides that the provisions of the state Medicaid plan become mandatory upon and must be in effect in all political subdivisions of the state.  42 U.S.C. § 1396a(a)(1); 42 C.F.R. § 431.50; *see* N.C. Gen. Stat. § 108-54.

27.     States participating in Medicaid are entitled to receive Federal Financial Participation (FFP) for Medicaid services provided to eligible beneficiaries, which means that the federal government matches all state Medicaid expenditures at a specified rate.  42 U.S.C. §

6

1396b(a).   Until June 30, 2011, North Carolina will receive a federal matching rate of approximately 75%, and thereafter a federal matching rate of approximately 65%.  76 Fed. Reg. 5811 (Feb. 3, 2011).

28.     In order for a service to be covered under the state Medicaid plan, it must fit within one of the service categories listed in the Medicaid Act.  42 U.S.C. § 1396d(a).

29.     Coverage of certain services is mandatory under Medicaid.  42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a).  42 C.F.R. §§ 440.210, 440.220.  For example, States that elect to participate in the Medicaid program must cover nursing facility services for individuals over 21 years of age.  42 U.S.C. § 1396d(a)(4)(A).

30.     States may also cover certain optional services, including personal care services. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(24); 42 C.F.R. §§ 440.167, .225.   Federal law defines PCS as "services furnished to an individual who is not an inpatient or resident of a hospital, nursing facility, intermediate care facility for the mentally retarded or institution for mental diseases that are (1) authorized . . . by a physician in accordance with a plan of care or treatment. . . (2) provided by an individual who is qualified to provide such services who is not a member of the individual's family; and (3) furnished in a home, and, at the State's option, in another location."  42 C.F.R. § 440.167.

31.     CMS' *State Medicaid Manual* provides that personal care services "may include a range of human assistance provided to persons with disabilities and chronic conditions of all ages which enables them to accomplish tasks that they would normally do for themselves if they did not have a disability.  Assistance may be in the form of hands-on assistance (actually performing such a personal care task for a person) or cueing so the person performs the task by him/her self.  Such assistance most often relates to performance of ADLs [activities of daily

living] and IADLs [instrumental activities of daily living]. ADLs include eating, bathing, dressing, toileting, transferring, and maintaining continence. IADLs capture more complex life activities and include personal hygiene, light housework, laundry, meal preparation, transportation, grocery shopping, using the telephone, medication management, and money management." CMS, *State Medicaid Manual* § 4480.C, *available at* http://www.cms.gov/Manuals/PBM/list.asp?listpage=2.

32. North Carolina's state Medicaid plan includes coverage of PCS. 10A NCAC 22O. 0120.

33. Once a state chooses to provide an optional service, it must fully adhere to all applicable requirements of federal law and regulations.

34. Medicaid requires that states cover certain categories of individuals and allows coverage of others. "Categorically needy" Medicaid beneficiaries are those beneficiaries who fit into a particular category of children, pregnant women, or aged, blind or disabled individuals and have incomes below specified levels. 42 U.S.C. § 1396a(a)(10)(A), 42 C.F.R. § 435.100-435.236. "Medically needy" Medicaid beneficiaries are those who meet categorical requirements for such assistance, have incomes exceeding categorically needy levels, but have medical expenses that are high enough to reduce their available monthly income to a specified low level. 42 U.S.C. § 1396a(a)(10)(C); 42 C.F.R. § 435.300-.350.

35. Under federal Medicaid requirements, states must ensure that services are available in an equal "amount, duration and scope" for all categorically needy Medicaid beneficiaries. 42 U.S.C. § 1396a(a)(10)(B)(i); 42 C.F.R. § 440.240(b)(1). States must also must ensure that services are available in an equal "amount, duration and scope" for all individuals in a covered medically needy group. 42 C.F.R. § 440.240(b)(2).

8

36.     Therefore, with certain exceptions not relevant here, the federal Medicaid statute requires that Defendant cover benefits under its Medicaid program, including PCS, that are equal in amount, duration and scope to all categorically eligible beneficiaries.

37.     A State Medicaid program must use "reasonable standards (which shall be comparable for all groups …) for determining eligibility for and the extent of medical assistance under the plan which … are consistent with the objectives" of the program.  42 U.S.C. § 1396a(a)(17).

38.     The Medicaid Act requires that states provide for granting an opportunity for a hearing to individuals whose claims for medical assistance is denied or not acted upon with reasonable promptness.  42 U.S.C. § 1396a(a)(3).

**B.     Due Process**

39.      The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution also prohibits states from denying, reducing, or terminating Medicaid services without due process of law.  The Constitutional right includes the right to meaningful notice prior to the termination of Medicaid benefits, continued benefits pending a pre-termination hearing, and a fair and impartial pre-termination hearing.  *Goldberg v. Kelly*, 397 U.S. 254 (1970).  Federal Medicaid regulations explicitly implement the due process requirements set forth in *Goldberg*. 42 C.F.R. § 431.205(d).

40.     As set forth in *Goldberg* and incorporated in the Medicaid regulations, recipients are entitled to receive timely, adequate, and understandable written notices of their hearing rights when an action affects their claim for health services;  the hearing must be fair and impartial and held at a meaningful time; and coverage of services must be continued at the prior-approved level until a final *de novo* hearing decision if: (a)  a Medicaid recipient requests a fair hearing

9

before the date that the services are to be stopped or reduced; (b) the recipient requests the hearing within 10 days of the mailing of the notice; or (c) the requisite notice is not sent.  42 C.F.R. Part 431.

### C. <u>Anti-Discrimination Laws</u>

41. In enacting the Americans with Disabilities Act, Congress found that "[i]ndividuals with disabilities continually encounter various forms of discrimination, including…segregation…." 42 U.S.C. § 12101(a)(5).

42. Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity or be subjected to discrimination by such entity."  42 U.S.C. § 12132.

43. Regulations implementing Title II of the ADA make clear that the ADA requires that:  "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).

44. Regulations implementing Title II of the ADA provide:  "A public entity may not, directly or through contractual or other arrangements, utilize criteria or other methods of administration:  (i) that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the entity's program with respect to individuals with disabilities. . . ." 28 C.F.R. § 35.130(b)(3).

45. The U.S. Supreme Court in *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581 (1999), held that the unnecessary institutionalization of individuals with disabilities is a form of discrimination under Title II of the ADA.  In doing so, the Court interpreted the ADA's

"integration mandate" to require that persons with disabilities be served in the community when: (1) community-based treatment is appropriate; (2) the individual does not oppose community placement; and (3) community placement can be reasonably accommodated. *Id.* at 607.

46.     Section 504 of the Rehabilitation Act of 1973, on which the ADA is modeled, sets forth similar protections against discrimination by recipients of federal funds, such as the Defendant. 29 U.S.C. §§ 794-794a. These protections include the prohibition against unnecessary segregation of people with disabilities. Regulations implementing Section 504 require that a public entity administer its services, programs and activities in "the most integrated setting appropriate" to the needs of qualified individuals with disabilities. 28 C.F.R. § 41.51(d).

47.     Section 504's regulations prohibit recipients of federal financial assistance from utiliz[ing] criteria or methods of administration ... (i) [t]hat have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons. 28 C.F.R. § 41.51(b)(3)(I); 45 C.F.R. § 84.4(b)(4).

VI.     STATEMENT OF FACTS

     A.     <u>Named Plaintiffs.</u>

     <u>Named Plaintiff Henry Pashby.</u>

48.     Henry Pashby is a 53 year-old resident of Forest City, North Carolina and is eligible to receive Medicaid services. Mr. Pashby has a number of medical conditions, including multiple sclerosis and carpal tunnel syndrome. Additionally, Mr. Pashby lost the use of his left leg as the result of two strokes. Because of these medical conditions, Mr. Pashby requires assistance in bathing and dressing. He also requires assistance with meal preparation and light

Case 5:11-cv-00273-BO   Document 44   Filed 07/11/11   Page 11 of 44

housework. His aide also assists him in remembering to take his medications. He currently receives 33 hours per month of PCS through Medicaid.

49.     In May 2011, Mr. Pashby received a letter from the Carolina Centers for Medical Excellence (CCME) informing him that PCS would end on June 1, 2011, and would be replaced by a program called In-Home Care for Adults (IHCA). The letter informed Mr. Pashby that he was not eligible for the new IHCA program, but it did not contain any information specific to his needs or assessment. The letter did not include CCME's determination of which of his ADLs require assistance and instead simply contained the generalized statement that his "assessed activities of daily living do not meet the minimum IHCA program requirements … ." Without information regarding the assessment of his particular needs, Mr. Pashby is not sufficiently informed to be able to challenge the decision.

50.     Mr. Pashby does not have natural supports that are able to provide him with the same level of assistance as provided by his PCS provider. He has no family who live in the area, and no other caretakers who would be able to provide him with the amount of assistance that his aide currently provides.

51.     If the in-home PCS provided to Mr. Pashby ends, it is likely that Mr. Pashby will be forced to enter a facility because he would be unable to adequately care for himself.

52.     Mr. Pashby is currently receiving in-home PCS services after a successful mediation of his appeal of the IHCA denial. However, Mr. Pashby is subject to re-evaluation and it is likely he will face a reduction or complete termination of his in-home PCS services.

53.     It would be significantly less expensive to cover the in-home PCS that Mr. Pashby needs than to cover services for him in an ACH, nursing facility, or other institutional setting.

Named Plaintiff Annie Baxley.

54.     Annie Baxley is a 69 year-old resident of St. Pauls, North Carolina who is eligible to receive Medicaid services. Ms. Baxley has a number of medical problems, including lung cancer, anxiety, chronic obstructive pulmonary disease, dizziness, hyperlipidemia, and idiopathic peripheral neuropathy.  Because of these medical conditions, Ms. Baxley requires assistance with bathing and mobility.  She has difficulty getting in and out of the tub, is very unsteady on her feet and sometimes needs the aide to hold her hand when she walks.  She also requires assistance with cooking and household chores.

55.     She currently receives 28 hours per month of PCS through Medicaid. However, she was receiving 60 hours per month prior to April 2011.

56.     On May 13, 2011, Ms. Baxley received a letter from the CCME informing her that PCS would end on June 1, 2011, and would be replaced by a program called In-Home Care for Adults (IHCA).  The letter informed her that she was not eligible for the new IHCA program, but it did not contain any information specific to her needs or her assessment.  The letter did not include CCME's determination of which of her ADLs require assistance and simply stated that her "assessed activities of daily living do not meet the minimum IHCA program requirements… ." Without information regarding the assessment of her particular needs, Ms. Baxley is not sufficiently informed to be able to challenge the decision.

57.     Ms. Baxley lives alone and she does not have anyone else who is able to provide her with the same level of assistance as provided by her PCS aide.  Although she is able to complete some tasks on her own, there is a substantial risk that Ms. Baxley might fall and injure herself should she attempt the activities of daily living with which she currently receives assistance.

13

58.    If the in-home PCS provided to Ms. Baxley ends, it is likely that Ms. Baxley will be forced to enter a facility because she would be unable to adequately care for herself.

59.    Ms. Baxley is currently receiving in-home PCS services after a successful mediation of her appeal of the IHCA denial.  However, Ms. Baxley is subject to re-evaluation and it is likely she will face a reduction or complete termination of her in-home PCS services.

60.    It would be significantly less expensive to cover the in-home PCS that Ms. Baxley needs than to cover services for her in an ACH, nursing facility, or other institutional setting.

Named Plaintiff Margaret Drew.

61.    Margaret Drew is a 63 year-old resident of Charlotte, North Carolina who is eligible to receive Medicaid services. Ms. Drew has a number of medical problems, including pulmonary hypertension, arthritis, diabetes, vision impairment, carpal tunnel syndrome, heart disease, and orthopedic impairment.  Because of these medical conditions, Ms. Drew requires assistance with bathing and dressing.  She also requires assistance with household chores.  She currently receives 28 hours per month of PCS through Medicaid.

62.    In May 2011, Ms. Drew received a letter from the CCME informing her that PCS would end on June 1, 2011, and would be replaced by a program called In-Home Care for Adults (IHCA).  The letter informed Ms. Drew that she was not eligible for the new IHCA program, but it did not contain any information specific to her needs or assessment.  The letter did not include CCME's determination of which of her ADLs require assistance and instead simply contained the generalized statement that her "assessed activities of daily living do not meet the minimum IHCA program requirements … ."  Without information regarding the assessment of her particular needs, Ms. Drew is not sufficiently informed to be able to challenge the decision.

63.     Ms. Drew lives alone and she does not have anyone else who is able to provide her with the same level of assistance as provided by her PCS aide.  Although Ms. Drew has two sisters who live in the area, one sister is ill and the other cannot provide assistance.

64.      If the in-home PCS provided to Ms. Drew ends, it is likely that Ms. Drew will be forced to enter a facility because she would be unable to adequately care for herself.

65.     Ms. Drew is currently receiving in-home PCS services after a successful mediation of her appeal of the IHCA denial.  However, Ms. Drew is subject to re-evaluation and it is likely she will face a reduction or complete termination of her in-home PCS services.

66.     It would be significantly less expensive to cover the in-home PCS that Ms. Drew needs than to cover services for her in an ACH, nursing facility, or other institutional setting.

        <u>Named Plaintiff Deborah Ford.</u>

67.     Deborah Ford is a 60 year-old resident of Winston-Salem, North Carolina and is eligible to receive Medicaid services.  Ms. Ford has a number of medical conditions, including depression, hypertension, incontinence and emphysema.  Because of these medical conditions, Ms. Ford requires assistance in getting out of bed, bathing and dressing.  She also requires assistance with light housework, meal preparation and the maintenance of her colostomy bag. She currently receives 28 hours per month of PCS through Medicaid, although she had been previously authorized to receive 60 hours per month.

68.     In May 2011, Ms. Ford received a letter from the CCME informing her that PCS would end on June 1, 2011, and would be replaced by a program called In-Home Care for Adults (IHCA). The letter informed Ms. Ford that she was not eligible for the new IHCA program, but it did not contain any information specific to her needs or assessment.  The letter did not include CCME's determination of which of her ADLs require assistance, rather it simply contained the

generalized statement that her "assessed activities of daily living do not meet the minimum

IHCA program requirements … ." Without information regarding the assessment of her

particular needs, Ms. Ford is not sufficiently informed to be able to challenge the decision.

69. Ms. Ford does not have anyone else who is able to provide her with the same

level of assistance as provided by her PCS aide. She has a daughter who is unable to provide

assistance.

70. If the in-home PCS provided to Ms. Ford ends, it is likely that Ms. Ford will be

forced to enter a facility because she would be unable to adequately care for herself.

71. Ms. Ford is currently receiving in-home PCS services after a new CCME

assessment. However, Ms. Ford is subject to re-evaluation and it is likely she will face a

reduction or complete termination of her in-home PCS services.

72. It would be significantly less expensive to cover the in-home PCS that Ms. Ford

needs than to cover services for her in an ACH, nursing facility, or other institutional setting.

Named Plaintiff Melissa Gabijan.

73. Melissa Gabijan is a 28 year-old resident of Raeford, North Carolina who is

eligible to receive Medicaid services. Her mother, Jamie Gabijan, is her guardian. Ms. Gabijan

has a number of medical problems, including traumatic brain injury, seizures, and early stage

dementia. Because of these medical conditions, Ms. Gabijan requires assistance with bathing

and dressing. She also requires assistance with household chores. She currently receives 24

hours per month of PCS through Medicaid.

74. In May 2011, Ms. Gabijan received a letter from the CCME informing her that

PCS would end on June 1, 2011, and would be replaced by a program called In-Home Care for

Adults (IHCA). The letter informed Ms. Gabijan that she was not eligible for the new IHCA

program, but it did not contain any information specific to her needs or assessment. The letter did not include CCME's determination of which of her ADLs require assistance, rather it simply contained the generalized statement that her "assessed activities of daily living do not meet the minimum IHCA program requirements ....." Without information regarding the assessment of her particular needs, Ms. Gabijan and her guardian are not sufficiently informed to be able to challenge the decision.

75. Ms. Gabijan does not have natural supports who are able to provide her with the same level of assistance as provided by her PCS aide. Her mother (with whom she lives) already provides a substantial amount of care for Ms. Gabijan. However, her mother works and cannot provide her with the amount of assistance that her aide provides.

76. If the in-home PCS provided to Ms. Gabijan ends, it is likely that Ms. Gabijan will be forced to enter a facility because she would be unable to adequately care for herself.

77. It would be significantly less expensive to cover the in-home PCS that Ms. Gabjian needs than to cover services for her in an ACH, nursing facility, or other institutional setting.

Named Plaintiff Micheal Hutter.

78. Micheal Hutter is a 35 year-old resident of Mooresville, North Carolina and is eligible to receive Medicaid services. Mr. Hutter has a number of medical conditions, including cerebral palsy, conduct disorder, and borderline personality disorder. Because of his cerebral palsy, he requires assistance in bathing, dressing and eating. He also requires assistance with light housework. He currently receives 30 hours per month of PCS through Medicaid.

79. In May 2011, Mr. Hutter received a letter from the CCME informing him that PCS would end on June 1, 2011, and would be replaced by a program called In-Home Care for

Adults (IHCA). The letter informed Mr. Hutter that he was not eligible for the new IHCA program, but it did not contain any information specific to his needs or assessment. The letter did not include CCME's determination of which of his ADLs require assistance, rather it simply contained the generalized statement that his "assessed activities of daily living do not meet the minimum IHCA program requirements … ." Without information regarding the assessment of his particular needs, Mr. Hutter is not sufficiently informed to be able to challenge the decision.

80.    Mr. Hutter does not have friends or family who are able to provide him with the same level of assistance as provided by his PCS aide. His mother lives more than an hour away and cannot provide him with the amount of assistance that his aide provides.

81.    If the in-home PCS provided to Mr. Hutter ends, it is likely that Mr. Hutter will be forced to enter a facility because he would be unable to adequately care for himself.

82.    Mr. Hutter is currently receiving in-home PCS services after a successful mediation of his appeal of the IHCA denial. However, Mr. Hutter is subject to re-evaluation and it is likely he will face a reduction or complete termination of his in-home PCS services.

83.    It would be significantly less expensive to cover the in-home PCS that Mr. Hutter needs than to cover services for him in an ACH, nursing facility, or other institutional setting.

Named Plaintiff Lucretia Moore.

84.    Lucretia Moore is a 48 year-old resident of Leland, North Carolina and is eligible to receive Medicaid services. Ms. Moore has a number of medical conditions, including arthritis, bipolar disorder, tendonitis and degenerative disc disease. Because of these medical conditions, Ms. Moore requires assistance in bathing and dressing. She also requires assistance with light housework and needs to be reminded to take her medication. She currently receives

18

27 hours per month of PCS through Medicaid, although she had been receiving 60 hours per month previously.

85.     In May 2011, Ms. Moore received a letter from the CCME informing her that PCS would end on June 1, 2011, and would be replaced by a program called In-Home Care for Adults (IHCA).The letter informed Ms. Moore that she was not eligible for the new IHCA program, but it did not contain any information specific to her needs or assessment.  The letter did not include CCME's determination of which of her ADLs require assistance, rather it simply contained the generalized statement that her "assessed activities of daily living do not meet the minimum IHCA program requirements … ."  Without information regarding the assessment of her particular needs, Ms. Moore is not sufficiently informed to be able to challenge the decision.

86.     Ms. Moore does not have natural supports able to provide her with the same level of assistance as provided by her PCS aide.   Her 17 year-old son provides some assistance and he also helps with her 5 year-old son with autism who needs extensive assistance, but he will be leaving for college in the fall of 2011.  No one else would be able to provide her with the amount of assistance that her aide currently provides.

87.     If the in-home PCS provided to Ms. Moore ends, it is likely that Ms. Moore will be forced to enter a facility because she would be unable to adequately care for herself.

88.     Ms. Moore is currently receiving in-home PCS services after receiving a letter that her hours were restored.  However, Ms. Moore is subject to re-evaluation and it is likely she will face a reduction or complete termination of her in-home PCS services.

89.     It would be significantly less expensive to cover the in-home PCS that Ms. Moore needs than to cover services for her in an ACH, nursing facility, or other institutional setting.

Named Plaintiff James Moore.

90.     James Moore is a 70 year-old resident of Dunn, North Carolina and is eligible to receive Medicaid services.  Mr. Moore has a number of medical conditions, including cancer, chronic obstructive pulmonary disease, emphysema, chronic bronchitis and heart disease. Because of these medical conditions, Mr. Moore requires assistance in bathing and eating.  He also requires assistance with light housework and his aide reminds him to take his medications. He currently receives 28 hours per month of PCS through Medicaid.

91.     In May 2011, Mr. Moore received a letter from the CCME informing him that PCS would end on June 1, 2011, and would be replaced by a program called In-Home Care for Adults (IHCA). The letter informed Mr. Moore that he was not eligible for the new IHCA program, but it did not contain any information specific to his needs or assessment.  The letter did not include CCME's determination of which of his ADLs require assistance, rather it simply contained the generalized statement that his "assessed activities of daily living do not meet the minimum IHCA program requirements … ."  Without information regarding the assessment of her particular needs, Mr. Moore is not sufficiently informed to be able to challenge the decision.

92.     Mr. Moore does not have sufficient natural supports able to provide him with the same level of assistance as provided by his PCS aide.   Although he has two daughters who live in the area, one owns her own business and the other comes by as often as she can.  No one else would be able to provide him with the amount of assistance that his aide currently provides.

93.     If the in-home PCS provided to Mr. Moore ends, it is likely that Mr. Moore will be forced to enter a facility because he would be unable to adequately care for himself.

94.     Mr. Moore is currently receiving in-home PCS services after receiving a letter that he was eligible for IHCA.  However, Mr. Moore is subject to re-evaluation and it is likely he will face a reduction or complete termination of his in-home PCS services.

95.     It would be significantly less expensive to cover the in-home PCS that Mr. Moore needs than to cover services for him in an ACH, nursing facility, or other institutional setting.

Named Plaintiff Ayleah Phillips.

96.     Ayleah Phillips is a 61 year-old resident of Asheboro, North Carolina and is eligible to receive Medicaid services.  Ms. Phillips has a number of medical conditions, including multiple sclerosis, hypertension, hepatitis C, arthritis and heart problems.  Because of these medical conditions, Ms. Phillips requires assistance in bathing and dressing.  She also requires assistance with light housework and her aide assists her in remembering to take her medications.  She currently receives 29 hours per month of PCS through Medicaid.

97.     In May 2011, Ms. Phillips received a letter from the CCME informing her that PCS would end on June 1, 2011, and would be replaced by a program called In-Home Care for Adults (IHCA).  The letter informed Ms. Phillips that she was not eligible for the new IHCA program, but it did not contain any information specific to her needs or assessment.  The letter did not include CCME's determination of which of her ADLs require assistance, rather it simply contained the generalized statement that her "assessed activities of daily living do not meet the minimum IHCA program requirements … ."  Without information regarding the assessment of her particular needs, Ms. Phillips is not sufficiently informed to be able to challenge the decision.

98.     Ms. Phillips does not have family in friends in the area who are able to provide her with the same level of assistance as provided by her PCS aide.   She has no family who live

21
Case 5:11-cv-00273-BO   Document 44   Filed 07/11/11   Page 21 of 44

in the area. No one else would be able to provide her with the amount of assistance that her aide currently provides.

99. If the in-home PCS provided to Ms. Phillips ends, it is likely that Ms. Phillips will be forced to enter a facility because she would be unable to adequately care for herself.

100. It would be significantly less expensive to cover the in-home PCS that Ms. Phillips needs than to cover services for her in an ACH, nursing facility, or other institutional setting.

Named Plaintiff Alice Shropshire.

101. Alice Shropshire is a 67 year-old resident of Greensboro, North Carolina and is eligible to receive Medicaid services. Ms. Shropshire has a number of medical conditions, including diabetes, hypertension, depression, bronchitis and spondylosis of the cervical spine. Because of these medical conditions, Ms. Shropshire requires assistance in bathing and maintaining her balance. She also requires assistance with light housework and meal preparation. She currently receives 28 hours per month of PCS through Medicaid.

102. In May 2011, Ms. Shropshire received a letter from the CCME informing her that PCS would end on June 1, 2011, and would be replaced by a program called In-Home Care for Adults (IHCA). The letter informed Ms. Shropshire that she was not eligible for the new IHCA program, but it did not contain any information specific to her needs or assessment. The letter did not include CCME's determination of which of her ADLs require assistance, rather it simply contained the generalized statement that her "assessed activities of daily living do not meet the minimum IHCA program requirements … ." Without information regarding the assessment of her particular needs, Ms. Shropshire is not sufficiently informed to be able to challenge the decision.

103.     Ms. Shropshire does not have natural supports able to provide her with the same level of assistance as provided by her PCS aide.   No one else would be able to provide her with the amount of assistance that her Personal Care aide currently provides.

104.     If the in-home PCS provided to Ms. Shropshire ends, it is likely that Ms. Shropshire will be forced to enter a facility because she would be unable to adequately care for herself.

105.     Ms. Shropshire is currently receiving in-home PCS services after a successful mediation of her appeal of the IHCA denial.  However, Ms. Shropshire is subject to re-evaluation and it is likely she will face a reduction or complete termination of her in-home PCS services.

106.     It would be significantly less expensive to cover the in-home PCS that Ms. Shropshire needs than to cover services for her in an ACH, nursing facility, or other institutional setting.

Named Plaintiff Sandy Splawn.

107.     Sandy Splawn is a 51 year-old resident of Rutherfordton, North Carolina and is eligible to receive Medicaid services.  Ms. Splawn has a number of medical conditions, including chronic obstructive pulmonary disease, emphysema, chronic asthma, degenerative disc disease, osteoporosis, diabetes, coronary artery disease, and obesity.  Because of these medical conditions, Ms. Splawn requires assistance with bathing and dressing.  She also requires assistance with household chores.  She currently receives 32 hours per month of PCS through Medicaid.

108.     In May 2011, Ms. Splawn received a letter from the CCME informing her that PCS would end on June 1, 2011, and would be replaced by a program called In-Home Care for

Adults (IHCA). The letter informed Ms. Splawn that she was not eligible for the new IHCA program, but it did not contain any information specific to her needs or assessment. The letter did not include CCME's determination of which of her ADLs require assistance, rather it simply contained the generalized statement that her "assessed activities of daily living do not meet the minimum IHCA program requirements … ." Without information regarding the assessment of her particular needs, Ms. Splawn is not sufficiently informed to be able to challenge the decision.

109.     Ms. Splawn does not have family members who are able to provide her with the same level of assistance as provided by her PCS aide. Although her mother lives nearby, she has health problems that limit her ability to assist. Her daughter lives in the area, but works full-time and therefore is unable to provide Ms. Splawn with the amount of assistance that her aide provides.

110.     If the in-home PCS provided to Ms. Splawn ends, it is likely that Ms. Splawn will be forced to enter a facility because she would be unable to adequately care for herself.

111.     Ms. Splawn is currently receiving in-home PCS services after a successful mediation of her appeal of the IHCA denial. However, Ms. Splawn is subject to re-evaluation and it is likely she will face a reduction or complete termination of her in-home PCS services.

112.     It would be significantly less expensive to cover the in-home PCS that Ms. Splawn needs than to cover services for her in an ACH, nursing facility, or other institutional setting.

Named Plaintiff Robert Jones.

113.     Robert Jones is a 67-year-old resident of Elizabeth City, North Carolina who is eligible to receive Medicaid services. He lives with his cousin-in-law Joseph Percer, who is his attorney in fact. Mr. Jones has a number of medical problems, including schizophrenia, mental

retardation, diabetes and high blood pressure. Because of these conditions, Mr. Jones requires assistance with bathing, dressing, food preparation, taking his medications and managing his affairs. Mr. Jones was approved to receive PCS by CCME in 2007. Until November 2010 he was receiving 48 hours of PCS per month. At that time, his hours were reduced to 27 hours per month.

114.    In May 2011, Mr. Jones received a letter from CCME notifying him that his PCS would be terminated effective June 1, 2011. The letter stated that Mr. Jones was no longer eligible for PCS because he did not need help with three ADLs but it did not tell him which ADLs he needed assistance with and which ADLs could be considered in determining his eligibility. Neither Mr. Jones nor his attorney in fact was able to understand the notice.

115.    Mr. Jones appealed the May 2011 notice of termination to the N.C. Office of Administrative Hearings.  His PCS was reinstated pending the outcome of his appeal. Mr. Jones was represented in that administrative appeal by Faye Lewis, a paralegal with Legal Aid of North Carolina. At a telephone mediation on June 14, 2011, a representative of CCME informed Mr. Jones and Ms. Lewis that unless they could show that he needed help with three ADLs, Mr. Jones could not win his administrative appeal.  Based on this representation, Mr. Jones agreed at the mediation to dismiss his administrative appeal.  As a result, his PCS stopped on June 14, 2011.

116.    Mr. Jones does not have sufficient natural supports to replace the loss of PCS. Both Mr. Percer and Mr. Jones' sister provide some assistance to him but both have their own severe physical disabilities and can only provide limited help to him. According to his physicians, Mr. Jones is at significant risk of irreparable harm to his health and safety if his PCS is not reinstated.  In addition, Mr. Jones is at significant risk of institutionalization if his PCS is

not reinstated.

117.    It would be significantly less expensive to cover the in-home PCS that Mr. Jones needs than to cover services for him in an ACH, nursing facility, or other institutional setting.

Named Plaintiff Rebecca Pettigrew

118.    Rebecca Pettigrew is a 57-year-old resident of Smithfield, North Carolina who is eligible to receive Medicaid services.   Ms. Pettigrew has a number of medical problems, including arthritis, diabetes, chronic obstructive pulmonary disease, HIV/AIDS, asthma, fibromyalgia, diabetic neuropathy in both legs and one arm and problems associated with the sciatic nerve.   Because of these conditions, Ms. Pettigrew requires assistance with bathing, dressing and eating.

119.    In May 2011, Ms. Pettigrew received a letter from CCME notifying her that she was eligible to continue to receive her PCS through the new IHCA program.

120.     In June 2011, Ms. Pettigrew received a letter from CCME notifying her that she was no longer eligible for services under the IHCA program.  She has been receiving 25 hours of in-home aide services.  The letter stated that Ms. Pettigrew was no longer eligible for IHCA because she did not need help with three ADLs but it did not tell her which ADLs she needed assistance with and which ADLs could be considered in determining her eligibility. The letter also did not tell Ms. Pettigrew what had changed in her level of need to cause her eligibility to change since the May 2011 letter approving her for IHCA.

121.    Ms. Pettigrew received the June 2011 notification of termination from CCME the day after she was assessed by CCME.  During the assessment, she was asked to do things she did not regularly do, such as try to enter the shower/bathtub by herself or move around her home using her rolling walker.  Ms. Pettigrew also understood the nurse assessor to say that she should

be getting more hours.  Ms. Pettigrew injured her shoulder trying to enter the shower/bathtub independently and could not get out of bed by without assistance the following day.

122.    Ms. Pettigrew does not have sufficient natural supports to replace the loss of her in-home care services.  Ms. Pettigrew's mother lives close by but needs assistance with her own care and cannot provide the necessary help for Ms. Pettigrew.  Without assistance from an in-home aide, Ms. Pettigrew is at significant risk of falling and becoming injured.  Such fall injuries could likely lead to hospitalization.

123.    It would be significantly less expensive to cover the in-home PCS that Ms. Pettigrew needs than to cover services for her in an ACH, nursing facility, or other institutional setting.

### B.    Adult Care Homes (ACHs)

124.    ACHs are assisted living facilities in which staff members provide scheduled and unscheduled PCS to two or more residents.  Some ACHs provide supervision to individuals with cognitive impairments whose decisions may jeopardize their safety or well being.  N.C. Gen. Stat. § 131D-2.1(3); *see also* 10A NCAC 13F.

125.    As of January 2011, there were more than 600 ACHs in North Carolina with a total of more than 36,000 beds.

126.    Many ACHs are large facilities that have more than 80 beds.

127.    The physical layout of many ACHs is similar to that of an institution.

128.    Approximately 4,800 ACH beds are located in nursing homes and nearly 50% of the 400 licensed nursing homes in North Carolina also have licensed ACH beds. *See* 10 NCAC 13F .1303, .1304.

129.    Many ACHs have special locked units.  See 10 NCAC 13F.1304.

130.    Many ACHs are in rural areas or other areas with little or no access to public transportation.

131.    ACHs are designed to provide custodial care and supervision, which limits the resident's autonomy.   Residents may be subject to 24-hour supervision. 10A NCAC 13F.0901.

132.    Schedules are regimented for the convenience and efficiency of ACH staff rather than resident-centered.

133.    Many activities in ACHs are done in a group, including meals, which are served in groups at set times.

134.    Residents generally are unable to manage their own activities such as cooking, taking medication, cleaning, budgeting and handling their own money.

135.    ACHs may impose restrictions on visits by family and friends.  10A NCAC 13F .0906(f)(2).

136.    Residents in ACHs may be assigned a roommate not of their choice.

137.    Residents are entitled to locked storage space only if the ACH administrator or supervisor has access.  N.C. Gen. Stat. § 131D-21(12).

138.    Chemical and physical restraints may be ordered against the resident's will.  N.C. Gen. Stat. § 131D-21(5); 10A NCAC 13F .1501.

139.    Medications are administered by staff unless a doctor orders otherwise. 10A NCAC 13F .1005

140.    The facility often receives the resident's Social Security, Social Security Income, or Veteran's Administration benefits check directly and applies it to the facility's charges. *See*, 10A NCAC 13F .1103(b) and .1104

141.    ACHs are licensed and regulated by the N.C. Division of Facility Services. N.C. Gen. Stat. 131D-2.4.

142.    The resident has no right to smoke tobacco inside the ACH, even in his own room. N.C. Gen. Stat. 131D-4.4.

143.    Residents of ACHs are required to be immunized annually. N.C. Gen. Stat. 131D-9.

144.    Residents of ACHs are offered few activities in the community, and these activities frequently do not offer opportunities to interact with non-disabled peers.

145.    Admission to an ACH requires only the "opinion of the resident, physician, family or social worker, and the administrator [that] the services and accommodations of the home will meet his particular needs." 10A NCAC 13F .0701(a).

146.    North Carolina operates the State-County Special Assistance Program (Special Assistance) for individuals with monthly incomes below $1,182 living in ACHs. N.C. Gen. Stat. § 108A-40-47.1. To medically qualify for Special Assistance, a physician must determine that an individual needs care in an ACH. *See* 10A NCAC 71P.0906.

147.    Approximately seventy percent of all ACH residents are eligible for Special Assistance.

C.    **Coverage of Personal Care Services in North Carolina**

i.    **In-Home PCS**

148.    The standards for qualifying for PCS in the home are much stricter than the standards for qualifying for PCS in an ACH.

149.    Prior to implementation of Defendant's challenged new eligibility requirements, in order to qualify for PCS in the home, an individual had to require hands-on assistance with

two or more of five listed ADLs: bathing, dressing, toileting, mobility, and eating. DMA 4/16/10 Clinical Coverage Policy 3C, pp. 7, 10.

150.    It was also necessary for an individual to have a medical diagnosis that required a physician's care and be under the care of a physician. 10A NCAC 22O. 0120(a)(1).

151.    Until April 1, 2010, a registered nurse for a certified home care provider could provide an assessment for an individual to receive PCS in their home.

152.    In 2009, North Carolina entered into a contract with the Carolinas Center for Medical Excellence (CCME) to conduct independent assessments for in-home PCS. CCME began processing in-home PCS referrals and conducting independent assessments of PCS applicants and recipients on April 1, 2010.

153.    Many individuals who have been referred by their physicians for in-home PCS have waited weeks and months for CCME to perform assessments, causing serious harm including hospitalization or placement in nursing facilities.

154.    On June 30, 2010, the North Carolina General Assembly enacted a law renaming the PCS benefit and replacing it with a substantially similar service called In Home Care for Adults (IHCA) and In Home Care for Children (IHCC). N.C. Sess. Laws 2010-31, § 10.35, p. 87.

155.    The law provides that IHCA is available to meet eating, dressing, bathing, toileting, and mobility needs of individuals 21 years and older who have unmet needs for three of five qualifying ADLs with limited hands-on assistance; or two ADLs, one of which requires assistance at either the extensive or dependent level. N.C. Sess. Laws 2010-31, § 10.35, p. 87. This law makes the eligibility requirements for PCS for individuals 21 years or older even stricter.

156.     On October 25, 2010, Defendant requested that CMS grant permission to amend its state Medicaid plan to make the changes described in N.C. Sess. Laws 2010-31, submitting a proposed state plan amendment (SPA) describing the requested changes.   Dep't of Health & Human Servs., Transmittal and Notice of Approval of State Plan Material (SPA 10-31).

157.     SPA 10-31 provides that PCS are available to individuals living in private residences only if they require limited hands-on assistance with three or more ADLs or require assistance with two or more ADLs, one of which is at the extensive or full dependence level. Coverage is limited to 80 hours per month.  SPA 10-31, p. 20.

158.     SPA 10-31 also described requirements for covering PCS in ACHs (addressed below).  The eligibility requirements for PCS in ACHs are much less stringent than PCS for individuals 21 years or older living at home (renamed IHCA).

159.     CMS approved SPA 10-31 in April 2011.  Letter from Jackie Glaze, Assoc. Regional Administrator, Div. of Medicaid & Children's Health Ops., CMS, to Craigan Gray, Director, DMA, N.C. DHHS (April 18, 2011) (Letter approving SPA) (Approval Letter).

160.     Defendant has issued proposed clinical coverage policies governing the provision of IHCA.  Covered tasks include assistance with qualifying ADLs, IADLs directly related to the ADLs, assistance with assistive or adaptive devices or durable medical equipment, or assistance with certain Nurse Aide tasks.   ICHA Policy 3E, p. 4.  The qualifying ADLs are eating, dressing, bathing, toileting, and mobility.  *Id.,* p. 1.

161.     The Clinical Coverage Policies provide that individuals may only qualify for IHCA if they require hands-on assistance with three of the five qualifying ADLs at the limited assistance level or hands on assistance with two ADLs, one of which is at either the extensive or full dependence level. ICHA Policy 3E, p. 10.

31

162.     The assessment tool used to determine need for IHCA must contain a rating of the individual's ability to perform a task.  Ratings are described as follows:

(a)  Can do with limited hands-on assistance:  recipient is able to self-perform more than 50% of activity and requires hands-on assistance to complete remainder of activity;

(b) Can do with extensive hands on assistance:  recipient is able to perform less than 50% of activity and requires hands-on assistance to complete remainder of activity.

(c) Cannot do at all (full dependence):  recipient is unable to perform any of the activity and is totally dependent on another to perform all of the activity.

*Id.,* p. 9.

163.     ICHA recipients must be under the direct care of a physician for the medical conditions causing the functional limitations necessitating PCS and the PCS must be directly linked to that medical condition.  *Id.*, p. 3.

164.     In order for ICHA to be authorized, there must be no available, willing, and able household member who can provide PCS on an ongoing basis.  *Id.*, p. 4.

165.     Defendant's clinical coverage policies provide that "cueing, prompting, guiding, or coaching may be provided as part of the hands-on assistance to recipients for the qualified ADLs, but do not constitute a covered service in and of themselves."  *Id.,* p. 5.

166.     The maximum amount of ICHA that may be authorized is 80 hours per month.  *Id.,* p. 4.

167. DMA has estimated that 3,500 to 4,000 individuals who are currently receiving in-home PCS will no longer be eligible under IHCA's more stringent eligibility requirements. DMA, Information on the New IHC Programs (May 2011).

### ii.    PCS in Adult Care Homes

168. The eligibility requirements for PCS in ACHs are much lower than the eligibility requirements for receiving PCS at home. There are also a greater number of ADLs that qualify an individual to receive PCS, a lower threshold for the degree of assistance required, no hour limitation on services, and a much easier, less cumbersome authorization process.

169. Regulations provide that individuals in ACHs may obtain assistance with the following seven ADL's: bathing, dressing, personal hygiene, ambulation or locomotion, transferring, toileting, and eating. 10A NCAC 13F. 0801.

170. A care plan submitted to obtain approval for Medicaid-funded PCS in an ACH requires only a physician's certification that the resident "has a medical diagnosis with associated physical/mental limitations warranting the provision of personal care services in the above care plan." 10A NCAC 13F .0802.

171. Unlike In-Home PCS, there is no requirement for prior approval by DHHS or its agent before an ACH resident can receive PCS.

172. Assessments for ACH PCS are performed by staff of the facility that will be paid by Medicaid to provide PCS, not by CCME or any other agent of DHHS. 10A NCAC 13F. 0801.

173. DHHS has not promulgated or announced any Clinical Coverage Policy that sets forth eligibility criteria for PCS in ACHs. Currently, persons receive PCS in ACHs who only

require limited supervision and do not require hands-on assistance with their ADLs. Persons in ACHs can also receive PCS if they require only limited assistance with one ADL.

174. In contrast to the rules governing IHCA, there are no restrictions on coverage of PCS in an ACH, a link between a documented medical condition and the assistance needed, and the recipient being under the direct care of a physician for that condition, all of which are required for IHCA.

175. According to DHHS, individuals may qualify for ACH PCS if they need assistance with one of the seven listed ADLs or require limited supervision.

176. Newly approved SPA 10-31 provides that individuals living in ACHs are eligible for personal care services if they:

(a) Have a cognitive disorder, chronic or progressive medical condition, or physical disability that impedes their ability to self-perform common ADLs, and

(b) Are subject to health, safety, and security risks because there is no capable and willing caregiver to assure that health and welfare needs will be met in a private residence. SPA 10-31, p. 20.

In addition, individuals must also require at least two of the following:

(a) Ongoing supervision;

(b) Medication administration or assistance;

(c) Limited, extensive, or full assistance with at least two of the following ADLs: toileting, eating, ambulation, bathing, personal hygiene, dressing, and transferring;

(d) Assistance with IADLs including light housework, meal preparation, shopping, errands, use of telephone, money management, and use of technology.

177.    Defendant has not publicly announced any action to implement the new requirements contained in SPA 10-31 to receive PCS in an ACH. Defendant has not created any clinical coverage policy to implement SPA 10-31 for PCS in ACHs. Plaintiffs are not aware of any notices going to ACH residents or providers. The May 2011 Medicaid Bulletin issued by Defendant makes no reference to PCS in ACHs. *See* N.C. Div. of Med. Assist., *May 2011 Medicaid Bulletin* (updated May 13, 2011), http://www.ncdhhs.gov/dma/bulletin/ 0511bulletin.htm. Thus, the eligibility requirements for PCS in ACHs effectively remain the same: an individual may receive PCS if the individual requires assistance with one or more ADL or the individual requires limited supervision. The assessment continues to be done by an ACH staff person, and no DHHS prior approval is required.

178.    As a result of the differences between the policies and practices governing IHCA and ACH PCS, after June 1, 2011, many individuals who live in ACHs will be able to receive PCS if they remain in these facilities, while individuals with comparable or greater medical need and need for assistance in performing basic ADLs who live in their own homes will not unless they move into an ACH.

### iii.    **Assurances to CMS**

179.    Before CMS approved SPA 10-31, Defendant did not inform CMS of important differences between the amount, duration, and scope of coverage of PCS for individuals living in private residences and individuals living in ACHs.

180.    Defendant incorrectly informed CMS that ACH residents require 24/7 supervision and PCS and that they are not able to live safely in their communities.

181.    Defendant incorrectly informed CMS that ACH residents need medication management and those receiving PCS in their homes do not.

35

182.     Defendant incorrectly informed CMS that in home PCS residents would be assessed for their need for IHCA services in a timely manner.

183.     Defendant falsely assured CMS prior to approval of SPA 10-31 that the CCME assessment results containing recipient-specific information would be included in the notice of termination. *See* Draft Response to CMS RAI dated Jan. 20, 2011, p. 2.

184.     When approving SPA 10-31, CMS indicated that "approval of this State Plan Amendment relates solely to the availability of FFP for Medicaid covered services. *This action does not in any way address the State's independent obligation under the Americans with Disabilities Act or the Supreme Court's Olmstead decision.*" Approval Letter, p. 1 (emphasis added).

### D.     <u>Due Process Violations</u>

185.     During May 2011, CCME used the results of the most recent assessment on file to determine whether many current PCS recipients would qualify for IHCA.

186.     Defendant has already sent termination notices to recipients of in-home PCS, including Plaintiffs, informing them that they will not qualify for IHCA.

187.     These notices state: "Medicaid did not approve the request to transfer to IHCA because your assessed activities of daily living do not meet the minimum IHCA program requirements of hands on assistance for unmet needs with three qualifying activities of daily living, or with two qualifying activities of daily living at least one of which requires extensive hands on assistance."

188.     The notices do not specify the relevant ADLs that were considered.

189.     The notices do not specify the level of assistance that CCME determined was necessary.

190.    The notices do not contain any attachment describing the assessment, despite the fact that DMA made representations to the contrary to CMS.

191.    The notices are not written in a manner that is understandable to PCS residents, many of whom have cognitive impairments or limited literacy.

192.    The notices do not include the specific legal authority (IHCA Clinical Policy 3E) that supports the decision or a correct website address by which to locate that policy.

## VII. CAUSES OF ACTION

### First Cause of Action:  Americans with Disabilities Act

193.    Plaintiffs incorporate and re-allege paragraphs 1 through 192, as if set forth fully herein.

194.    Defendant Cansler is Secretary of the Department of Health and Human Services, which is a public entity under the ADA.

195.    Each Plaintiff is a "qualified individual with a disability" within the meaning of the ADA in that they (1) have a physical impairment that substantially limits one or more major life activities; (2) are capable of safely living in their homes with necessary services; and (2) meet the essential requirements for the North Carolina Medicaid program with reasonable modifications to the rules, policies, and practices of the program.  42 U.S.C.  § 12131(2).

196.    Defendant's denial of coverage of personal care services that Plaintiffs require in order to avoid institutional placements and to remain in the integrated home settings appropriate to their needs constitutes unlawful discrimination in violation of Title II of the ADA, 42 U.S.C. § 12132.

197.    Defendants have utilized criteria and methods of administration that subject Plaintiffs to discrimination on the basis of disability, including unnecessary institutionalization,

by failing to ensure that Plaintiffs have access to Medicaid-covered personal care services that meet their needs in the community and/or requiring Plaintiffs to live in institutional settings in order to obtain the services they need.

198.     Defendant's actions violate Title II of the ADA.

**Second Cause of Action:  Section 504 of the Rehabilitation Act**

199.     Plaintiffs incorporate and re-allege paragraphs 1 through 198, as if set forth fully herein.

200.     Each Plaintiff is a "qualified person with a disability" within the meaning of Section 504, because they (1) have physical and/or mental impairments that substantially limit one or more major life activities; and (2) meet the essential eligibility requirements for North Carolina Medicaid.

201.     Defendant conducts, operates, and/or administers the state Medicaid program, is a recipient of federal funds, and therefore is subject to the requirements of Section 504.

202.     Defendant's denial of coverage for the personal care services that Plaintiffs require in order to avoid segregation in institutional placements and to remain in integrated home settings that are appropriate to their needs constitutes unlawful discrimination in violation of Section 504 of the Rehabilitation Act.

203.     Defendant has utilized criteria and methods of administration that subject Plaintiffs to discrimination on the basis of disability, including unnecessary institution, by failing to ensure that Plaintiffs have access to Medicaid-covered personal care services that meet their needs in the community and/or requiring Plaintiffs to live in institutional settings in order to obtain the services they need.

## Third Cause of Action:  Medicaid Comparability

204.    Plaintiffs incorporate and re-allege paragraphs 1 through 203, as if set forth fully herein.

205.    Defendant has instituted rules, policies, and procedures that will reduce, suspend, deny, or terminate coverage of personal care services for many Medicaid beneficiaries based solely on the fact that they live in their own homes, while individuals living in Adult Care Homes who have the same or lesser need for personal care services will continue to receive them.

206.    Defendant, by creating one eligibility standard for personal care services for individuals living in their homes and another standard for individuals living in Adult Care Homes, violates the federal Medicaid comparability requirement.  42 U.S.C. § 1396a(a)(10)(B).

## Fourth Cause of Action:  Medicaid Reasonable Standards

207.    Plaintiffs incorporate and re-allege paragraphs 1 through 206, as if set forth fully herein.

208.    Defendant will cover personal care services for Medicaid recipients living in Adult Care Homes, while denying the same services to other Medicaid recipients with comparable needs, and will use eligibility criteria that do not provide a reasonable measure of need for personal care services.

209.    N.C. Proposed Medicaid Clinical Coverage Policy 3E are inconsistent with and in conflict with the reasonable standards requirement of the federal Medicaid Act, 42 U.S.C. § 1396a(a)(17), and interpretive federal guidelines, and is therefore preempted pursuant to the Supremacy Clause of the U.S. Constitution, art. IV.

39

## Fifth Cause of Action: Medicaid Notice and Hearing Requirements

210.     Plaintiffs incorporate and re-allege paragraphs 1 through 209, as if fully set forth herein.

211.     Defendant has engaged in a practice of issuing notices that fail to cite the relevant legal authority, policy or regulations supporting its decision.

212.     Defendant has engaged in a practice of failing to provide an adequate explanation of the reasons for its decision in the written notice to the recipient.

213.     Defendant's practices and procedures alleged herein violate the Medicaid Act, by failing to provide for granting an opportunity for a fair hearing before the state agency to any individual whose claim for medical assistance is denied or not acted upon with reasonable promptness.

214.     These violations, which have been repeated and knowing, entitle the Plaintiffs and plaintiff class to relief under 42 U.S.C. § 1983 and 42 U.S.C. § 1396a(a)(3) of the Medicaid Act.

## Sixth Cause of Action: Constitutional Due Process

215.      Plaintiffs incorporate and re-allege paragraphs 1 through 214, as if fully set forth herein.

216.     Defendant's practices and procedures alleged herein violate the Due Process clause of the Fourteenth Amendment to the U.S. Constitution by, among other things, denying the Plaintiffs and Plaintiff class a fair and non-arbitrary decision-making process, meaningful notice, meaningful opportunity for a fair hearing; and advance notice and the opportunity for a fair hearing prior to suspension or termination of services previously authorized by the state.

217.    These violations, which have been repeated and knowing, entitle the Plaintiffs and plaintiff class to relief under 42 U.S.C. § 1983 and the Fourteenth Amendment to the U.S. Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Certify this action as a class action pursuant to Fed. R. Civ. P. 23;

2.    Issue a declaratory judgment pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 that: (a) Defendant's laws and policies governing coverage of personal care services violate the Americans with Disabilities Act and Section 504 of the Rehabilitation Act; (b) Defendant's laws and policies governing coverage of personal care services violate Medicaid's comparability and reasonable standards requirements; and (c) Defendant's failure to provide notice and an opportunity for a hearing when eliminating or reducing coverage of personal care services under Medicaid due to the practices and procedures alleged herein violates the named Plaintiffs' and the Plaintiff class's rights under the Due Process Clause of the Fourteenth Amendment and the Social Security Act, 42 U.S.C. § 1396a(a)(3); (b); and (c).

3.    Grant a preliminary and permanent injunction requiring the Defendant, his agents, successors, and employees to:

(a) continue to provide personal care services to all persons who have been receiving them, until Defendant corrects the rules, policies, practices and procedures alleged herein;

(b) prospectively reinstate personal care services previously provided to the named Plaintiffs and members of the Plaintiff class that were improperly reduced or terminated under the illegal rules, policies, practices and procedures alleged herein;

(c) comply with the Due Process Clause of the U.S. Constitution and the

Medicaid Act;

4. Retain jurisdiction over this action to insure Defendant's compliance with the

mandates of the Court's Orders;

5. Award to the Plaintiffs costs and reasonable attorney fees pursuant to 42 U.S.C. §

1988; and

6. Order such other relief as this Court deems just and equitable.


Dated:   July 11, 2011

ATTORNEYS FOR PLAINTIFF AND PLAINTIFF CLASS


/s/ John R. Rittelmeyer
John R. Rittelmeyer
N.C. State Bar No. 17204
Jennifer L. Bills
N.C. State Bar No. 37467
Elizabeth D. Edwards
N.C. State Bar No. 35262
DISABILITY RIGHTS NC
2626 Glenwood Avenue, Suite 550
Raleigh, NC  27608
Phone: (919) 856-2195
Fax:     (919) 856-2244
john.rittelmeyer@disabilityrightsnc.org
jennifer.bills@disabilityrightsnc.org
elizabeth.edwards@disabilityrightsnc.org


/s/ Douglas S. Sea
Douglas Stuart Sea
State Bar No. 9455
LEGAL SERVICES OF SOUTHERN PIEDMONT, INC.
1431 Elizabeth Avenue
Charlotte, North Carolina  28204
Telephone:  (704) 376-1600
dougs@lssp.org

/s/ Sarah Somers
Sarah Somers
State Bar No. 33165
Jane Perkins
State Bar No. 9993
NATIONAL HEALTH LAW PROGRAM
101 E. Weaver Street, Ste. G-7
Carrboro, NC  27510
Telephone:  (919) 968-6308
somers@healthlaw.org
perkins@healthlaw.org

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the attached document or pleading was electronically served upon all parties registered for CM/ECF in this matter.

This the 11th day of July, 2011.

/s/John R. Rittelmeyer

John R. Rittelmeyer